**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ERIC MATTHEW DEPREZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:16-cv-02632** |
| **v.** | ) | **Chief Judge Crenshaw** |
| | ) | **Magistrate Judge Brown** |
| | ) | |
| **NANCY BERRYHILL,[1]** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge

## REPORT AND RECOMMENDATION

Pending before the court is Plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which Defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 17). Plaintiff has filed a reply to Defendant's response. (Docket Entry No. 18). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 12),[2] and for the reasons given herein, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff, Eric Matthew DePrez, filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on May 15, 2014, alleging disability onset as of

---

[1]Nancy Berryhill became acting Commissioner for the Social Security Administration on January 23, 2017, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

November 18, 2013, due to post-traumatic disorder.  (Tr. 15, 77-78).  Plaintiff's claim was denied

at the initial level on July 10, 2014, and on reconsideration on October 23, 2014.  (Tr. 86-88, 99,

102, 105-06, 108).  Plaintiff subsequently requested *de novo* review of his case by an administrative

law judge ("ALJ").  (Tr. 124).  The ALJ heard the case on March 1, 2016, when Plaintiff appeared

with counsel and gave testimony.  (Tr. 15, 33-69).  Testimony was also received by a vocational

expert.  (Tr. 70-74).  At the conclusion of the hearing, the matter was held open to allow time for

performance of a psychological evaluation until May 4, 2016, when the ALJ issued a written

decision finding Plaintiff not disabled.  (Tr. 12-28, 75).  That decision contains the following

enumerated findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.   The claimant has not engaged in substantial gainful activity since November 18, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following medically determinable impairment: post-traumatic stress disorder (20 CFR 404.152 *et seq.*).

4.   The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).

5.   The claimant has not been under a disability, as (defined in the Social Security Act, from November 18, 2013, through the date of this decision (20 CFR 404.1520(c)).

(Tr. 17, 28).

On September 13, 2016, the Appeals Council denied Plaintiff's request for review of the

ALJ's decision (Tr. 1-5), thereby rendering that decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

The claimant alleged disability on November 18, 2013, based only on post-traumatic stress disorder (PTSD).

Review of the evidence revealed that the claimant is currently a 100-percent service-connected disabled veteran based on PTSD, with initial award of 50 percent, then 70 percent (Exs. 6D and 7D).

While the VA disability rating is evidence an adjudicator must consider along with other evidence in the case record, the disability rating is not a medical opinion that SSA adjudicators must evaluate under 20 CFR 404.1527. There are several other reasons why the Agency does not merely adapt the VA ratings decision: The VA does not make an onset finding, rather disability compensation is only payable from the date the veteran filed his application.

Therefore, the effective date of a VA rating has no medical significance. The VA expresses disability as a percentage of diminished earning capacity in contrast to the SSA, which determines whether a claimant is disabled or blind (See 20 CFR 404.1501). The VA disability rating is based on a consideration of the effects of a disease/injury of a hypothetical average person's ability without consideration of a specific veteran's age, education or work experience. The VA's determination that a veteran is unemployable is not the same as a step 4 or 5 finding under Agency's regulations. The VA considers a veteran to be unemployable if he is unable to find, or secure or follow a substantially gainful occupation, as a result of his disabilities (38 CFR 4.16). In contrast, the SSA adjudicator at steps 4 and 5 result from a comparison of an individually-determined residual functional capacity with the physical and mental demands of specific occupations and rely on specific vocational resources of which, we take administrative notice, such as the Dictionary of Occupational Titles, and in many cases, vocational expert testimony (20 CFR 404.1560-1569a). Instructions AM-14009, dated February 20, 2014.

The claimant received primary care from the VA Medical Center. On February 29, 2013,[3] he underwent an initial compensation and pension (C&P) examination. However, the notes stated that he "Works in retail in varying contexts" and was currently working in a managerial job. On April 19, 2013, the claimant reported more labile[4] mood because he moved positions in his job and he was currently now worse. He was still having nightmares, "but they seem unrelated to actual events that happened during military service. Pt states he was part of an observation team, and his command accidently almost dropped a bomb on him." Ex. 1F, p.89.

During an August 27, 2013 psychiatric session, his prior actual diagnosis was anxiety disorder, N.O.S. (non-specific) while PTSD was only provided as rule-out diagnosis. He also presented with his three year-old son; and denied all of the following: hopelessness, worthlessness, guilt, flashbacks, "hyperstartle behavior," and anhedonia,[5] stating that he "helped out with the children, enjoy working in retail -my new job." He also admitted that Trazodone[6] had "really helped and only takes it as needed and not every night." He was having marital problems, stating they might get a counselor soon. Regarding his new work in retail, he added that he was "doing well but training the trainees can be stressful, but I'm happy to be there." Nevertheless, Jaymie Uy Avenido, M.D., (psychiatry resident) did diagnose the claimant with PTSD. Ex. 1 F.

On February 25, 2014, (when notes stated he was last seen in August 2013; and approximately three months after the alleged onset date), the claimant reported medication compliance, denying side effects from medication. He was also compliant with group psychotherapy for anger management, adding that he was "doing better on anger management." Notes stated that he lost [] both of his last jobs in July 2013 and November 2013 related to interpersonal relationships with his supervisors. Regardless, notes also stated that he "is currently actively looking for a job availabilities for managerial position." Additionally, claimant also stated that he "brings" his son to speech therapy every Tuesday, yet stated this was the first time he had been out of the house for two weeks. Regarding symptoms, he endorsed some hopelessness or worthlessness, constant tiredness, decreased energy and concentration, and anhedonia. He slept three hours per night; however, he had run out of Trazodone. He also reported loud noise triggers anxiety, such as hyperstartle

---

[3]This is a typographical error. The actual date was February 19, 2013. (Tr. 301, 306, 398, 403).

[4]"Labile" . . . "unstable; fluctuating." http://medical-dictionary.thefreedictionary.com/labile

[5]Anhedonia is the "total loss of feeling of pleasure in acts that normally give pleasure." *Dorland's Illustrated Medical Dictionary* 91 (32nd ed. 2012).

[6]Trazodone is an antidepressant. https://www.drugs.com/trazodone.html

and feeling on edge. His nightmares had increased from once a week to every night. He explained that this was combat-related, "been by a mine [field] not stuck in a mine field." However, he denied flashbacks. He hated to go to Walmart. His relationship with his wife was okay. Mental status examination revealed a tired-looking, yet engaging individual with good hygiene and grooming. He was calm and cooperative without evidence of psychomotor agitation or retardation. He was alert, fully oriented and maintained good eye contact. Speech was spontaneous with normal rate, volume and articulation. Mood and affect were anxious. Thought process was logical and goal-directed. Thought content was: "intends to attend psychology and group sessions, wants to find a job, no preoccupation or delusions." He denied suicidal/homicidal ideations and auditory/visual hallucinations. Regarding memory, this was "3/3 with prompts." Regarding concentration, he was "able to spell 'MONEY' backwards." His insight, judgment and reliability were fair. Major depressive disorder, recurrent, moderate was added as a diagnosis. Dr. Avenido increased Venlafaxine,[7] continued Prazosin,[8] restarted Trazodone, and encouraged additional anger management classes. Ex. l F.

The claimant later reported that he and his wife had welcomed their third son born in January 20 14. His wife, unfortunately, had experienced complications since the delivery and required hospitalization. Consequently, he reported distress related to her recovery and assuming all of the childcare for the three boys. Ex. 1F.

On March 31, 2014, he reported decreased frequency of nightmares, and denied flashbacks and any episodes of anxiety since previous follow-up. He still got up a few times at night, stating Trazodone only worked at the start only. He also continued to deny any problems or side effects with current medication. His relationship with his wife was okay. Ex. 1F.

The claimant's history was noted during the June 6, 2014 follow-up appointment. This included: serving in the U.S. Army from 1989-1995, "without any combat experience in Iraq at desert storm." He also "has no concerns or questions at this visit." Regarding nightmares, they were still there, but he could not remember them and the[y] were spaced out to once weekly. He continued to deny flashbacks. He also reported that he was not working, "but functional good on daily activity." Moreover, he denied all of the following: panic attacks with[]/without agoraphobia, generalized anxiety, excessive worry, racing thoughts, irritability, distractibility , and paranoia. In fact, Ahmed M. Abdel-Raouf, M.D., (psychiatry resident) stated, "Patient in full control of the thought without thought blocking, insertion, withdrawal

---

[7]Venlafaxine is an antidepressant. https://www.drugs.com/venlafaxine.html

[8]Prazosin may be used in helping to reduce nightmares and sleep problems associated with PTSD. http://www.webmd.com/a-to-z-guides/prazosin-for-ptsd; (Tr. 24, 66, 313).

or broadcasting." Regardless, Venlafaxine was increased, while Prazosin and Trazodone were continued. Ex. 1F, pp. 25-31.

Impression of Kenneth Oghale Osiezagha, M.D., on February 9, 2015, was that claimant was clinically stable, regarding PTSD. Of note, claimant stated he felt only a little bit depressed and denied aggressive behavior, stating that he was ever ready to engage anybody in altercation. Ex. 2F, pp. 50 and 53.

The claimant reported on March 27, 2015 that his mood had been "always tired," with excessive sleep and fatigue. He also reported that easy irritability and aggression continued, but were much improved. He "credits" using his increased awareness of triggers and coping skills for this. However, he was still unemployed because he felt he still could not stand being around people without getting angry and did not feel he could de-escalate his aggression in a work situation. Mental status examination remained unimpressive. He was fairly groomed. He was engaging during the interview process. He was calm and cooperative. He was alert and oriented on all four spheres. No psychomotor abnormality was noted. Speech was spontaneous with normal rate, volume, rhythm and articulation. Language was fluent. Mood was "always tired;" affect was mildly depressed. Thought process was linear and goal-directed. Thought content was "recent somnolence and feeling like he needs help with aggression so he can return to work." Insight, judgment, impulse control and reliability remained fair. Ex. 2F.

On May 23, 2015, claimant presented to the emergency room, alone, reporting he had fallen and struck his head while ice-skating with his son and had complaints of head pain/headache. Ten- system review was otherwise negative. Upon arrival, he was alert, fully oriented, in no acute distress and appeared stable. Examination was without positive clinical finding. Cranial nerves II-XII were intact. There was no asterixis and no sensory abnormalities; and no bruises, lesions, or swelling of the occipital scalp/head. CT scan of the head revealed no intracranial hemorrhage or depressed skull fracture. Ex. 2F, pp.16-19.

On June 10, 2015, impression of Ernest Ayodele Gbadebo-Goyea, M.D., was that claimant's PTSD was stable, while depressed mood with anxiety was only a rule-out diagnosis. Dr. Gbadebo-Goyea further explained that "pt. is relatively stable on current regimen and adherent to medication regimen without significant side effects verbalized except sexual s/e." Ex. 2F.

On October 26, 2015, claimant reported doing well on current medications. He did describe an episode a month ago at an Ikea store in Colorado. He explained that he was overwhelmed, had palpitations, sweatiness, chest tightness and feeling of impending doom, which lasted only for a couple of minutes. He also currently reported nightmares about three times a week, hypervigilance, avoidance of crowds. He had also gotten into it with his neighbor and had ongoing marital problems, which

had increased his anxiety. They were going through marriage counseling, reiterating that this did contribute to his anxiety. However, he denied multiple symptoms including any problems with appetite, any suicidal/homicidal thoughts/ideas, manic/hypomanic symptoms, any psychosis, hearing voices or being watched. Mental status examination was essentially normal with full orientation, appropriate affect, euthymic[9] mood, and linear and logical thought process. His PTSD remained stable, per Anthony C. Ekwo, M.D. Ex. 3F, p. 45.

One day later, however, he endorsed a myriad of symptoms, to include flashbacks; being very, very jumpy when encountering desert scenery, sudden loud noises, of smelling burning oil/diesel exhaust; nightmares related to his military service; avoidance of things, such as large crowds/large stores; school-wide events/military themed mov[i]es. He was mistrustful of others. He had panic attacks. His memory was "shot." He could not stay still. Interestingly, this was during a C&P examination for review of PTSD. However, he also reportedly maintained occasional contact with one comrade, who called to check on him and "enjoys spending time on his computer." Psychologist Jennifer A. Hanket-Held, M.D., stated that the conditions claimed were at least as likely as not (50 percent or greater probability) proximately due to or the result of veteran's service-condition condition. Ex. 3F.

Nevertheless, claimant's PTSD was again deemed stable on November 13, 2015, by Anthony D. Ekwo, M.D., (GAF 6-65). Ex. 3F, p.21. On November 30, 2015, he again reported doing well on current medications without side effects. Ex. 3F.

The claimant had no new concerns on January 11, 2016. He continued to report occasional panic symptoms, triggers included being in crowded places and ongoing marital issues with his wife. The frequency of his nightmares were about once per week. However, he also reported stable mood, denying flashbacks, depression, feelings of hopelessness or worthlessness, racing thoughts, hearing voices, being watched, suicidal/homicidal/assaultive ideation, and auditory/visual hallucinations. He was reportedly unable to tolerate higher dose of Prazosin due to poor erection and hypotension. He also relayed being stressed due to recent assault charges for fighting while in St. Louis during the holiday and going through marriage counseling, both of which contributed to anxiety. Mental status examination by Dr. Ekwo remained essentially normal with appropriate dress, eye contact, and affect. Full orientation, normal speech, linear and logical thought process, and thought content without delusion or obsession. Ex. 4F.

As indicated above a post-hearing psychological evaluation was performed in attempt to fully ascertain the claimant's mental status. This assessment was

---

[9]"Euthymia" . . . "a normal, tranquil mental state or mood." https://www.merriam-webster.com/medical/euthymia

performed by Bobbie L. Hand, M.S., on March 29, 2016. The claimant drove alone to the interview. He presented with neatly trimmed beard and mustache, clean hands and clean and trimmed fingernails. He sat and stood with ease. He was reportedly diagnosed with PTSD at the VA maybe four years ago. He was in the U.S. Army and in Iraq for nine months. His symptoms included hyperventilating, rapid heart rate and sweating; problems with tremors. If around too many people, he could not watch all of them at the same time, which reportedly became overwhelming and his hands shook. He had nightmares at night and a lack of interest in doing most things. When asked about his current symptoms, he stated, "Every now and then I feel bad; I don't know how much my medicine helps or doesn't." He had not attempted suicide, but was thinking about it a year ago and called the Crisis Hotline. He denied current suicidal/homicidal ideation. When asked about hallucinations, he said that he heard loud noises that woke him up. He had five "worst" days a week. On these days, he felt depressed, angry and anxious. He felt "nothing"on best days. The day of the evaluation was a bad day due to new environment. However, the examiner stated the claimant did not exhibit any outward signs of being uncomfortable or anxious in the office.

Regarding legal history, he stated that he had never been arrested. His work history after separating from the U.S. Army included being the manager at a retail Radio Shack electronics store from 1999 to 2008, in which the claimant ran all retail operations and supervised 25 employees at his store (Exhibits 3E, 3D, 9D). He was also a regional IT consultant until he was laid off due to national economic recession. The claimant continued to pursue management positions in 2013 (Exhibit 2F) and then collected unemployment insurance benefits in 2014 (Exhibit 11D), indicating that he had certified to the State Department of Labor that he was "ready, willing, and able"to work.

He lived with his pregnant wife and three young children. Regarding activities of daily living, he got up at 6:45 a.m. He prepared breakfast for his children; got them dressed and ready for school and drove them to school. In the afternoon, his wife had appointments; he drove his youngest child to speech and physical therapy and his middle child to speech and occupational therapy. His wife went in with the kids to the appointments. He got his kids ready for bed, got their pajamas on, made sure they brushed their teeth, and tucked them in. He went to bed between 11:00 p.m. and midnight. He slept two or three hours. Sometimes, he had nightmares and could not sleep. Regarding hobbies, he enjoyed computer programming. He was capable of taking [care] of his hygiene and self-care needs, but had to be reminded to bathe because he just did not think about it. He took out the trash and washed dishes. He was capable of doing other chores, but his wife primarily took care of cooking, making the bed, doing laundry, vacuuming and sweeping. He attended church once a week. His wife also grocery shopped. He owned a vehicle and drove daily.

The claimant was polite and appeared calm while in the waiting room, filling out paperwork. He did not exhibit symptoms as he prepared to leave. He described his problems factually, not exhibiting sign of depression. He readily comprehended directions for testing tasks and comprehended examiner's questions. His ability to concentrate appeared to be within normal limitations. His ability to recall appeared to be within normal limits. He appeared to exert adequate effort on testing tasks. Test results were considered valid.

On testing, he knew his date of birth and where he was born. He stated the names of two neighbors. He named the current U.S. president and named four recent presidents. He knew the name of the governor of Tennessee. He named five large cities and did not confuse cities with states. He correctly solved six simple arithmetic problems. He provided adequate meaning to simple proverbs. He gave a reason why foods need to be cooked. He was felt functioning within the average range of intelligence.

The examiner stated that although claimant described himself as having symptoms of PTSD, he did not exhibit symptoms of PTSD during the evaluation. Additionally, his adaptive functioning appeared to be well within normal limits. He assisted in the care of his three young children (ages two, five and seven). One of his children was on the autism spectrum and his youngest child was premature. He drove them to several appointments, such as physical, speech and occupational therapy. Impression was PTSD by history. The examiner determined: There appeared to be no limitation with regard to claimant's ability to understand. There appeared to be no limitations with regard to claimant's ability to concentrate and recall information. Social skills appeared to be within normal limits. There appeared to be no limitation with regard to claimant's adaptive functioning. This assessment was co-signed by Kathryn B. Sherrod, Ph.D. Ex. 5 F.

The attorney stated at the hearing that this is a psychological only case; no severe physical impairments.

### Testimony of claimant

The claimant testified that . . . he resides in a single-family house that he owns. He lives with his wife, who is expecting and three kids, ages 2, 5 and 7 years old. His wife is a stay-at-home mom. Desert Storm is the source of his PTSD. He was in firefights and injured (shoulder dislocation). He was not hospitalized for this. That was the last deployment for him; deployed in Iraq in 1993.

The claimant then relayed his work history. This included being store manager at Radio Shack supervising 25 employees from 2000 to 2008; hotel consultant (liaison between owner/management, independent contractors), IT consultant responsible for software implementation and computer system maintenance; laid off in 2012 due to

down-sizing; assistant manager dealing at Essex Technology with shipping/receiving, inventory and customer service; being fired from Essex and Staples for creating a hostile work environment and not getting along with upper management and having a few issues with customers.

He has had no mental health hospitalizations. He has a valid driver's license. He hasn't been arrested, but has had issues with law enforcement. He was charged with assault in St. Louis this past December 2015. He was on his way to see his parents for Christmas. He stopped there for lunch with his family and someone approached him with a derogatory statement. He warned the man to move on, but he continued to provoke him. He neutralized the threat by grabbing man's throat and throwing man down to the ground in shopping mall area. He was charged with assault. It went to court; this was continued. They met a couple of weeks ago. He hasn't heard of any conclusion.

He has had confrontations with neighbor. The neighbor has two little dogs, which he brings into claimant's yard to do their business. Claimant got tired of this, picked up poop, put it into a plastic bag and hung it on neighbor's door. When claimant got back later, he found bag on his door. He went over to neighbor's to complain. He has no problems with other neighbors.

Claimant has had a few calls for job interviews, but he didn't go to those interviews because leading up to the first one produced too much anxiety in him. He doesn't see the same psychiatrist every time. They're on rotation. He typically sees the same one until they rotate out. He doesn't know current psychiatrist's name. He has had discussion regarding his work ability. The doctor said he was too dangerous to work in public.

He only goes out in public with his wife. Often, he has to sit in [the] car after arriving places. Even with meds in him to help with these situations. He doesn't get along well with others. He had a daughter that died after 19 days. He lost his daughter in 2013. The whole family took that event very hard, but there wasn't any family therapy involvement. He is still grieving over this. His counselor is aware of this incident. His other kids and his wife are in good health.

He did not participate in any Vocational Rehabilitation. He tried through the VA, but they found him ineligible to participate because he had only a certain number of years after discharge from active duty to enroll in such services, and the allotted time had expired. He hasn't contacted the Tennessee State Vocational Rehabilitation Department. He is also in marriage counseling, which he and his wife attend.

He leaves home and goes into public about twice per week. He has an older son, who goes to hockey practice, which claimant attends as often as he can. He sits off to himself at hockey practice and sometimes has to go to the car and wait there. If

his wife needs to see the doctor, he goes with her to watch their child while she's in [the] exam room. He gets his two kids ready for school and drives them one block to school. He picks up kids from school. He gets the kids into bed at night. He is on medications for nightmares. He sleeps two to three hours per night and has daytime fatigue because of this. He has difficulty sleeping during the day also. He can't focus without getting distracted. He doesn't like to read, but he likes to watch TV. He can follow a 30-minute show okay, but usually has to break for 15 minutes during a full movie. He has had rare daytime flashbacks of Iraq, especially [the] smell of burning oil or loud sounds.

His parents live in northwestern Iowa. This is about a 16-hour road trip from home. The entire family went there for five days at Christmas.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant alleges he is disabled by severe PTSD resulting from his combat experiences in Iraq when he was in the U.S. Army. He described very serious symptoms, including nightmares, flashbacks and violent mood swings.

Yet, none of this [is] consistent with the evidence. His DD Form 214 does not reflect any real exposure to combat. It indicates slightly under three years of active service in the U.S. Army from May 29, 1992 to May 24, 1995 (Ex. 8D). This was well after Desert Storm concluded. Section 13 "Decorations" and Section 18 "Remarks" do not substantiate any service in hostile or hazardous duty locations; and he was separated by regular discharge for "completion of required active service"(Ex. 8D).

Moreover, long after his discharged from the Army, claimant worked full time for a number of years at highly skilled occupations, including store manager of a Radio Shack retail store from 1999 to 2008, where he ran all operations and supervised 25 employees (Exs. 3E, 3D and 9D).

When laid off as a Regional IR Consultant, he bounced around to a few other managerial jobs, was seeking management positions in 2013 (Ex. 2F) and collected unemployment insurance benefits in 2014 (Ex. 11D), indicating that he has certified to the State Department of Labor that he is "ready, willing, and able to work."

The assumption that he was not actually in combat was verified by June 2014 treatment notes, which actually stated his military service "was without any combat experience in Iraq at desert storm." He also had no concerns/questions at that visit;

and indicated he functioned rather well, stating he was not working, "but functional good on daily activity"(Ex. 1F).

Reverting back to prior notes, he also reported in August 2013 that his nightmares seemed unrelated to actual event that happened in military service, while denying flashbacks and hyperstartle behavior. In January 2014, he and his wife welcomed their third child, relating rather normal distress due to wife's complications after delivery, requiring hospitalization and caring for his three young children, including a newborn (Ex. 1F). In March 201 4, he reported decrease in nightmares and denied any anxiety since last visit (Ex. 1F). In February 2014, he reported that this was the first time [he] had left home in two weeks, yet simultaneously stated he took his son to speech therapy every Tuesday (Ex. 1F). In February 2015, June 2015, October 2015, and November 2015, his PTSD was deemed stable (Exs. 2F and 3F).

It was also most telling that when his PTSD was deemed stable in October 2015, when the claimant reported doing well with current medications, he denied several symptoms, to include any suicidal/homicidal ideation, manic/hypomanic symptoms, any psychosis, hearing voices or being watched. Regardless, only one day later when undergoing a C&P examination for review of PTSD; he endorsed a myriad of symptoms to include flashbacks (which he consistently denied during treatment otherwise); nightmares related to his military experience (which was actually without any combat experience in Iraq at Desert Storm); avoidance of school-wide events (though testified he attended his son's hockey practice); inability to stay still (not noted in treatment records); and that his memory was shot (yet, his thought process remained linear/logical throughout treatment) (Ex. 2F).

Additionally, as recently as January 2016, he reported a stable mood (Ex. 4F).

Furthermore, claimant has never been hospitalized or presented to the emergency room department for PTSD symptoms/behavior. His activities of daily living are full and robust, to include driving every day, helping take care of his three young children, one of whom is a special needs child; taking them to numerous appointments, including physical speech and occupational therapy and hockey practice. Claimant and his wife are expecting their 4th child in April 2016 (presumably now born). Claimant testified that he recently drove to visit his parents for five days in December. Claimant testified that he was charged with assault in December 2015; yet he subsequently told the psychological examiner that he had never been arrested (Ex. 5F). Finally, the claimant stated in the function report that he could only pay attention for 10 minutes; yet stated he got on the computer and usually searched the Web for news stories and was usually there until his wife made him get off about 1:00 a.m. to go to bed (Ex. 4E). The claimant's subjective complaints are not persuasive to the extent alleged.

For all of the reasons cited above, I give the opinion of consulting psychologist Bobbie Hand (Ex. 5F), who concluded the claimant has no severe mental impairment very great weight. In addition, I note that this opinion is consistent with the claimant's Global Assessment of Functioning (GAF) Scores, which typically ranged between 61-65. The DSM-IV-TR explains that GAF ratings in the range of 61-70 indicate only mild symptoms of mental impairment. Therefore, I also give great weight to these rather impressive GAF Scores because they are fully supported by the unremarkable and essentially normal mental status examinations, which normally revealed full orientation and linear/logical thought process.

I also note that on very rare occasions, the claimant's GAF Score was 55, indicating moderate symptoms of mental impairment, per the DSM-IV. However, I note his GAF Score was 55 when he was distressed over his wife's hospitalization relating to complications of giving birth and to his caring for their three young sons, including a newborn; and to conflict with a neighbor. However, his main source of stress seemed related to his marital problems. He also testified that he had a problem with a neighbor related to [the] neighbor's dog using his yard essentially as a bathroom, though he also testified that he got along with his other neighbors. Further, GAF Scores are not an assessment on the claimant's mental status and/or limitations on his mental status, they are used to track the clinical progress of an individual in global terms. *See also*, DSM-IV. Therefore, I give little weight to the GAF Score of 55.

To the extent, State agency psychological consultants, Victor O'Bryan, Ph.D., and Dorothy Tucker, Ph.D., (Exs. 1A and 4A) found the claimant with mild restriction of activities of daily living; and moderate difficulties with social functioning and in concentration, persistence and pace, I give the same little weight. These State agency psychological experts have not had the opportunity to examine the claimant. They also seem to rely heavily on the GAF Score of 55; and also note claimant's statement of being able to pay attention for about 10 minutes in the function report, despite his remaining on the computer until his wife made him get off at 1:00 a.m. to go to bed (Ex. 4E). I also note that after these opinions were rendered, the claimant was deemed stable at least four times, and before the claimant actually a stable mood.

The conclusion that the claimant does not have a physical impairment or combination of physical impairments that significantly limits his ability to perform basic work activities is supported by all of the reasons cited above.

Because the claimant has medically determinable mental impairments, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has no limitation. The claimant cares for his personal needs and helps care for his three, presumably now four young children. He gets them dressed and ready for school. He drives them to school. He gets them ready for bed, makes sure they brush their teeth and tucks them in. He regularly drives two of his children, one with special needs, to therapy appointments. He takes out trash and washes dishes, telling the psychological examiner that he is capable of doing other chores, but his wife primarily does those (Ex. 5F). He mows the grass and watches television (Ex. 4E). He stated that he was not working, "but functional good on daily activity" (Ex. lF).

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant reportedly has one comrade he maintains occasional contact with (Ex. 3F). He and his family spent Christmas 2015 with his family in another state, per testimony. He was described as polite during the psychological evaluation (Ex. 5F). He regularly attends church (Exs. 4E and 5F). He also reported in February 2015 that he had gone ice-skating (Ex. 2F).

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. He watches movies about two times per week. He spends hours on the computer; and is usually there until his wife makes him get off to go to bed (Ex. 4E). He is able to pay bills. He follows oral instructions well. If he actually reads written instructions, he follows them "good" (Ex. 4E). He performed well on testing during the psychological evaluation, and was felt to be of average intelligence (Ex. 5F). One of his treating psychiatrists stated "Patient in full control of the thought without thought blocking, insertion, withdrawal or broadcasting"(Ex. lF). Mental status examinations during treatment consistently revealed an alert individual with full orientation and linear/logical thought process.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(l)).

In sum, the claimant's impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities. Thus, the claimant does not have a severe impairment or combination of impairments.

(Tr. 18-28).

## III. CONCLUSIONS OF LAW

## A. Standard of Review

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the Commissioner's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387 (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (citations omitted). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be

justified based upon the record." *Miller,* 811 F.3d at 833 (citation and internal quotation marks omitted).

### B. Administrative Proceedings

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("[T]he claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act, as described by the Sixth Circuit as follows:

> (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the

burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The Social Security Administration can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). The grids otherwise only function as a guide to the disability determination. *Wright*, 321 F.3d at 615-16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE") testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the Commissioner must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

## C. Claims of Error

### 1. The ALJ failed to properly consider and give appropriate weight to Plaintiff's treating source's opinion.

Plaintiff argues that the ALJ did not properly consider or give appropriate weight to the medical opinion evidence of the doctors at the Veteran's Administration ("VA"), as a treating source. (Docket Entry No. 16, at 7-8). Plaintiff asserts that "[w]hile there is no document in the VA record which is expressly denominated a 'medical source statement,' there is a significant amount of information outlining various work-related limitations which the Plaintiff experienced which are found in the VA's Compensation and Pension examination reports," but that the ALJ failed to analyze these limitations, consistent with 20 C.F.R. § 404.1527(c). *Id.* at 8. In response, Defendant contends that these VA medical reports were forms geared toward assessing Plaintiff for VA disability programs and that the ALJ properly considered these reports as administrative findings and not medical opinions. (Docket Entry No. 17, at 13-14).

Social Security regulations address three classifications of medical sources: treating sources; examining but non-treating sources; and non-examining sources. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1502. A treating source has a history of medical treatment and an ongoing treatment relationship with the plaintiff consistent with accepted medical practice. *Id.* § 404.1502. An examining non-treating source has examined the plaintiff, but does not have an ongoing treatment relationship. *Id.* A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the plaintiff, but provides a medical or other opinion based upon medical and treatment records. *Id.* Opinions provided by treating sources are owed controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." *Id.*

18

§ 404.1527(c)(2). The regulations provide that an ALJ must provide "good reasons" for discounting the weight of a treating source opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The Sixth Circuit has stated that an ALJ is "not bound to accept the disability rating made by the Veterans Administration." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013). Title 20 C.F.R. § 404.1504 provides:

> A decision by any . . . other governmental agency about whether you are disabled . . . is based upon its rules and is not our decision about whether you are disabled . . . . We must make a disability . . . determination based on social security law. Therefore, a determination made by another agency that you are disabled . . . is not binding on us.

*Id.*[10] However, "a disability rating from the Veterans Administration is entitled to consideration." *Ritchie*, 540 F. App'x at 510; SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006) ("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."). The Sixth Circuit has not "specified the weight such a determination should carry when determining social security disability eligibility." *Ritchie*, 540 F. App'x at 510; *see also LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 387 (6th Cir. 2013) ("This court has not set forth a specific standard regarding the weight the Commissioner should afford a 100% disability determination by the VA.").

Here, the ALJ stated that "[w]hile the VA disability rating is evidence an adjudicator must consider along with other evidence in the case record, the disability rating is not a medical opinion

---

[10]Effective March 27, 2017, this section was amended. However, because Plaintiff filed his application for disability benefits with the Social Security Administration on May 15, 2014, the Court applies the version of 20 C.F.R. § 404.1504, as well as any other regulations, in effect at the time of his filing.

that SSA adjudicators must evaluate under 20 CFR 404.1527." (Tr. 18). The ALJ explained that the VA disability rating is based on different criteria than that used by the Social Security Administration. (Tr. 18-19). The ALJ then extensively discussed Plaintiff's VA medical record.

Plaintiff does not cite a specific medical opinion to which the ALJ failed to accord the proper consideration and weight. Plaintiff only cites Plaintiff's "work-related limitations . . . found in the VA's Compensation and Pension examination reports," titled "Post Traumatic Stress Disorder (PTSD) Disability Benefits Questionnaire," citing transcript pages 301-311 and 877-884. (Docket Entry No. 16, at 8). The ALJ noted that on February 19, 2013, Plaintiff underwent an initial compensation and pension ("C&P") examination and that the report noted that Plaintiff was working "in retail in varying contexts" and was "currently working in a managerial job." (Tr. 18, 306). This report was a check-mark form that was filled out nine months prior to Plaintiff's onset date. As to which best summarized Plaintiff's level of occupational and social impairment, the clinical psychologist checked "occupational and social impairment with reduced reliability and productivity." (Tr. 304). The report noted that Plaintiff was a forward observer in the Gulf War and that "a large bomb was nearly dropped on them - they felt the concussion blast." (Tr. 306). The only stressor that Plaintiff considered traumatic (pre-military, military, or post-military) was a "[n]ear miss involving bomb drop." (Tr. 307). Plaintiff re-experienced the event by "[r]ecurrent distressing dreams of the event" and "[p]hysiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." (Tr. 308). As to "Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness," the clinical psychologist checked, "[e]fforts to avoid thoughts, feelings or conversations associated with the trauma;" "[e]fforts to avoid activities, places or people that arouse recollections of the trauma;" and

"[f]eeling of detachment or estrangement from others." (Tr. 308-09). The clinical psychologist marked that Plaintiff had "[d]ifficulty falling or staying asleep;" "[i]rritability or outbursts of anger;" "[h]ypervigilance;" and [e]xaggerated startle response;" and that Plaintiff's PTSD symptoms "cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Tr. 309). For "VA rating purposes," the report reflected that Plaintiff had anxiety and "[p]anic attacks that occur weekly or less often." (Tr. 310). The clinical psychologist remarked, "clinically significant and moderately severe PTSD which is more likely than not due to effect of combat exposure." (Tr. 311).

Although the ALJ did not fully address this particular report, the record clearly reflects that the ALJ considered and extensively discussed Plaintiff's VA medical records, which contained similar information as that found in the February 19, 2013 report, in determining if Plaintiff was disabled under the Social Security regulations. The ALJ noted that in April 2013 Plaintiff reported more labile mood and that he was currently worse and that Plaintiff was "still having nightmares, 'but they seem unrelated to actual events that happened during military service.'" (Tr. 19, 377). The ALJ noted that Plaintiff "'was part of an observation team, and his command accidently almost dropped a bomb on him.'" *Id*. The ALJ noted that, during an August 2013 psychiatric session, Plaintiff denied feelings of hopelessness, worthlessness, guilt, flashbacks, "hyperstartle behavior," and anhedonia, that Trazodone had "'really helped,'" and that he enjoyed his new retail job. (Tr. 19, 355-56). Nevertheless, Jaymie Uy Avenido, M.D., (psychiatry resident), diagnosed Plaintiff with PTSD. (Tr. 19, 358). The ALJ noted that Plaintiff was not seen again until February 25, 2014, approximately three months after the alleged onset date, where Plaintiff reported that he was "'doing better on anger management.'" (Tr. 19, 335). Plaintiff reported that he was actively looking for a

managerial position. *Id.* Plaintiff reported feelings of "some hopelessness or worthlessness, constant tiredness, decreased energy and concentration, and anhedonia," and reported that "loud noise triggers anxiety," such as hyperstartle and "feeling on edge." *Id.* Plaintiff reported having nightmares from once a week to every night, which were combat-related. *Id.* However, Plaintiff denied having flashbacks. *Id.* Plaintiff was calm and cooperative; he was alert; his mood and affect were anxious; his thought process was logical and goal-directed; and his memory was "'3/3 with prompts.'" (Tr. 20, 336-37). The ALJ noted that major depressive disorder, recurrent, moderate, was added as a diagnosis. (Tr. 20, 3337).

The ALJ noted that on March 31, 2014, Plaintiff reported decreased frequency of nightmares and denied flashbacks and any episodes of anxiety since previous follow-up. (Tr. 20, 325). Plaintiff's history was noted during Plaintiff's June 6, 2014 follow-up appointment, which included that Plaintiff served in the U.S. Army from 1989-1995, "'without any combat experience in Iraq at desert storm.'" (Tr. 20, 312-13). Plaintiff had nightmares about once weekly, denied flashbacks, and reported that he was not working, "'but functional good on daily activity.'" (Tr. 20, 313). Plaintiff also denied having panic attacks, with/without agoraphobia; generalized anxiety; excessive worry; racing thoughts; irritability; distractibility; and paranoia. *Id.* Ahmed M. Abdel-Raouf, M.D., (psychiatry resident), noted, "'Patient in full control of the thought without thought blocking, insertion, withdrawal or broadcasting.'" (Tr. 20, 315). On February 9, 2015, Kenneth Oghale Osiezagha, M.D., noted that Plaintiff's PTSD was stable. (Tr. 20, 509). In March 2015, Plaintiff reported that easy irritability and aggression continued, but were much improved. (Tr. 20, 485). On June 10, 2015, Ernest Ayodele Gbadebo-Goyea, M.D., also noted that Plaintiff's PTSD was stable, while depressed mood with anxiety was only a rule-out diagnosis, and stated that Plaintiff

was relatively stable on his current regimen. (Tr. 21, 458, 461). On October 26, 2015, Plaintiff reported doing well on his current medications, but reported an incident in a store where felt overwhelmed, had palpitations, sweatiness, chest tightness and feeling of impending doom. (Tr. 21, 887). Plaintiff reported having nightmares about three times a week, hypervigilance, and an avoidance of crowds. *Id.* Plaintiff also reported that he was going through marriage counseling, which contributed to his anxiety. *Id.* The ALJ noted that Dr. Anthony C. Ekwo found that Plaintiff's mental status examination was essentially normal, with full orientation, appropriate affect, euthymic mood, and linear and logical thought process. (Tr. 21, 889). Plaintiff's PTSD remained stable. (Tr. 21, 890).

However, the ALJ noted that, one day later, Plaintiff "endorsed a myriad of symptoms, to include flashbacks; being very, very jumpy when encountering desert scenery, sudden loud noises, of smelling burning oil/diesel exhaust; nightmares related to his military service; avoidance of things, such as large crowds/large stores; school-wide events/military themed movies." (Tr. 21, 882). The ALJ noted that Plaintiff reported that he was mistrustful of others, had panic attacks, his memory was "'shot,'" and he could not stay still. *Id.* The ALJ noted that "[i]nterestingly," Plaintiff reported these symptoms during a C&P examination for review of PTSD. (Tr. 21). However, the ALJ noted that Plaintiff's "PTSD was again deemed stable on November 13, 2015," by Dr. Ekwo. (Tr. 21, 872). The ALJ further noted that on January 11, 2016, Plaintiff did not report any new concerns and continued to report occasional panic symptoms that were triggered by being in crowded places and ongoing marital issues. (Tr. 22, 982). Plaintiff reported having nightmares about once per week. (Tr. 22, 983). Plaintiff also reported stable mood and denied flashbacks, depression, feelings of hopelessness or worthlessness, racing thoughts, hearing voices, being

watched, suicidal/homicidal/assaultive ideation, and auditory/visual hallucinations. (Tr. 22, 983-84). The ALJ noted that Plaintiff's mental status examination by Dr. Ekwo remained essentially normal. (Tr. 22, 984).

Based upon the above, the record shows that the ALJ described the VA records in detail and properly considered and discussed the same VA medical records that the VA considered in making its disability determination, with the ALJ noting differences between the objective medical records and the disability rating. The SSA and the VA use different criteria in determining disability. Unlike the Social Security Administration, Title 38 U.S.C. § 5107(b) provides that the Secretary of the VA "shall give the benefit of the doubt to the claimant." The ALJ was not required to analyze the VA's disability determination consistent with 20 C.F.R. 404.1527 or give good reasons for not according weight to the VA disability determination. The ALJ's extensive discussion of the VA records demonstrate that the ALJ properly considered the disability determination of another governmental agency in accordance with *Ritchie*, 540 F. App'x at 510, and SSR 06-03p. *See Harrier v. Colvin*, No. 2:16-CV-11456, 2017 WL 2927629, at *2 (E.D. Mich. July 10, 2017) ("The ALJ's thorough discussion of the VA records demonstrates that she considered the disability decision of another government entity. The magistrate judge properly concluded that the ALJ satisfied SSR 06-03p.").

As to Plaintiff's argument that the ALJ assigned too much weight to the consulting medical sources, Bobbie Hand, Senior Psychologist Examiner, and Dr. Kathryn B. Sherrod, Clinical Psychologist, Ph. D., who examined Plaintiff after his hearing, Hand's narrative is the most detailed in the record and includes discussions of Plaintiff's complaints, daily activities, and mental status. (Tr. 1004-07). Hand also was the only source who administered intelligence testing, which showed

that Plaintiff had the memory and concentration to earn an average score. (Tr. 1005-06). Hand opined that Plaintiff did not exhibit symptoms of PTSD during his evaluation and his adaptive functioning appeared to be well within normal limits. (Tr. 1006). Hand concluded that Plaintiff had no limitation in understanding or concentrating, that his social skills were within normal limits, and that he had no limitation in adaptive functioning. *Id.*

Accordingly, the Magistrate Judge concludes that this claim of error is without merit.

**2. The ALJ erred in failing to find that Plaintiff has a severe impairment.**

Plaintiff argues that except for Hand's report the evidence clearly reflects that Plaintiff's PTSD imposes more than slight limitations on his ability to work, citing Plaintiff's confrontations that resulted in his firing, as well as his difficulty being around others, (Tr. 879), as some examples. (Docket Entry No. 16, at 11). Plaintiff also cites State agency psychological consultants, Victor O'Bryan, Ph.D., and Dorothy Tucker, Ph.D., who found Plaintiff with moderate difficulties in social functioning and in concentration, persistence and pace (Tr. 81, 94). *Id.* In response, Defendant contends that the ALJ carefully considered the severity of Plaintiff's mental complaints by analyzing Plaintiff's subjective complaints in the context of the entire record, including Plaintiff's reports to his doctors, medical opinion evidence, clinical mental status examinations, daily activities, and a full analysis of the consistency of Plaintiff's complaints with the underlying evidence. (Docket Entry No. 17, at 8).

At step two of the sequential evaluation process, a plaintiff bears the burden of showing that a medically determinable impairment is severe and meets the twelve month durational requirement of the Act. *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-04 (6th Cir. 2012). Symptoms alone cannot constitute a "medically determinable impairment." SSR 96-4p, 1996 WL 374187, at

*2 (S.S.A. July 2, 1996); *see id.* at *1 ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment."). A "severe impairment" is "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).[11] The Sixth Circuit has described the severity determination as "a *de minimis* hurdle in the disability determination process," in which "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The goal of this test is to screen out groundless claims. *Id*. at 863. Although "[s]everity is not an onerous requirement for the claimant to meet, . . . it is also not a toothless standard[.]" *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007); *Harley*, 485 F. App'x 802 (citing two physicians' reports that conflicted with the plaintiff's treating physician's opinion, the Sixth Circuit affirmed the Commissioner's finding of no severe impairment); *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929-30 (6th Cir. 2007) (holding that the ALJ's decision was supported by substantial evidence where the record did not reflect an inability to perform basic work functions). Further, a diagnosis alone does not establish an impairment's severity. *Despins*, 257 F. App'x at 930 ("The mere existence of . . . impairments . . . does not establish that [the plaintiff] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs*, 880 F.2d at 863 ("[M]ere

---

[11]Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 CFR § 404.1521(b) (2016).

diagnosis of arthritis . . . says nothing about the severity of the condition."); *Asbury v. Comm'r of Soc. Sec.*, No. 14-CV-13339, 2016 WL 739658, at *3 (E.D. Mich. Feb. 25, 2016) ("[D]iagnoses themselves generally do not establish disability; rather, disability is determined by the functional impairments caused by the diagnosis or condition. . . . And a diagnosis of a condition, without more, does not speak to the severity of the condition or the functional limitations associated with it."). "'In considering whether a claimant has a severe impairment, an ALJ must not accept unsupported medical opinions or a claimant's subjective complaints.'" *Wilkins v. Comm'r of Soc. Sec.*, No. 13-12425, 2014 WL 2061156, at *13 (E.D. Mich. May 19, 2014) (citations omitted).

When making an assessment of mental impairments at step two, "the regulations require the ALJ to follow a 'special technique' to assess the severity of the impairment." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (citing 20 C.F.R. § 404.1520a). The ALJ will rate the degree of a plaintiff's functional limitation in four broad areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). For the first three areas, the ALJ will rate the plaintiff on a five-point scale: "[n]one, mild, moderate, marked, and extreme." *Id*. § 404.1520a(c)(4). Decompensation is rated on a four-point scale: "[n]one, one or two, three, four or more." *Id.* If the degree of the plaintiff's limitation in the first three functional areas is rated "as 'none' or 'mild' and 'none' in the fourth area," the ALJ will generally conclude that the plaintiff's impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the plaintiff's ability to do basic work activities. *Id*. § 404.1520a(d)(1).

Here, after conducting an extensive review of the entire record, the ALJ properly concluded that Plaintiff's medically determinable mental impairments were nonsevere because they caused no

more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation that were of extended duration in the fourth area.  (Tr. 28).  The ALJ found that Plaintiff had no limitations in his ability to perform activities of daily living.[12]  (Tr. 27).  The ALJ noted that Plaintiff cared for his personal needs and those of his three (presumably now four) young children, including getting them dressed, driving them to school, getting them ready for bed, and making sure they brushed their teeth.  (Tr. 22, 27, 1004).  Plaintiff also regularly drove two of his children, one with special needs, to therapy appointments.  *Id.  See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) ("The ALJ also properly took into account Moore's daily activities, which included caring for two school-aged children and performing household chores.").  Plaintiff watched television, took out the trash, washed the dishes, mowed the grass, and stated that he was capable of doing other chores, but that his wife primarily did those.  (Tr. 27, 1004).  The ALJ also noted that in June 2014 Plaintiff reported "that he was not working, 'but functional good on daily activity.'"  (Tr. 20, 25, 27, 449).

As to social functioning, the ALJ found that Plaintiff had mild limitations in this area.  (Tr. 27).[13]  The ALJ considered that Plaintiff lost his last two jobs in 2013 "related to interpersonal

---

[12]"Activities of daily living"contemplate "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [the claimant's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).  The Commissioner "assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability."  *Id.*

[13]"Social functioning" refers to a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2).  A claimant "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  *Id.*  A claimant "may exhibit strength in social functioning by such things as [the claimant's] ability to

relationships with his supervisors" and that in March 2015 Plaintiff reported that "he was still unemployed because he felt he still could not stand being around people without getting angry and did not feel he could de-escalate his aggression in a work situation." (Tr. 19, 20). However, the ALJ noted that Plaintiff had a friend with whom he maintained occasional contact, that in December 2015 Plaintiff and his family spent Christmas with Plaintiff's parents in another state, that Plaintiff regularly attended church, that Plaintiff went ice-skating in May 2015, and that Plaintiff was described as polite during his psychological evaluation. (Tr. 21, 27, 68-69, 472, 879, 1004-05). In February 2014, Plaintiff was compliant with group psychotherapy for anger management, stating that he was "'doing better on anger management,'" and was looking for a managerial position. (Tr. 19, 335). The ALJ also noted that the medical record reflected that on February 9, 2015, Plaintiff was clinically stable with regard to PTSD, and denied aggressive behavior. (Tr. 20, 25, 506). The ALJ noted that Plaintiff reported on March 27, 2015, that he was still irritable and aggressive and felt he could not stand being around people without getting angry and did not feel he could de-escalate his aggression in a work situation. (Tr. 20, 485). However, Plaintiff admitted that his irritability and aggression were much improved, crediting his increased awareness of triggers and coping skills he had learned. *Id.* Further, in June 2015, August 2015, September 2015, October 2015, and November 2015, Plaintiff's PTSD was deemed stable. (Tr. 25, 461, 872, 890, 903, 910). Consultative examiners, Bobbie Hand, M.S., and Kathryn Sherrod, Ph.D., also opined that Plaintiff did not exhibit symptoms of PTSD during his evaluation and that Plaintiff's social skills were within

initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id.* The Commissioner also needs "to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." *Id.*

normal limits. (Tr. 23, 1006-07). Additionally, the medical record reflects that Plaintiff consistently was described as engaging, calm and cooperative throughout his treatment. (Tr. 20, 336, 488, 528, 534, 1005).

The record shows that the ALJ considered Plaintiff's complaints about his anger and his difficulty being around other people and that, despite Plaintiff's subjective opinion that he could not work, substantial evidence existed in finding that Plaintiff was only mildly limited in his social functioning. *Higgs*, 880 F.2d at 864; *Harley*, 485 F. App'x at 708.

The ALJ next found that Plaintiff had mild limitations in concentration, persistence, or pace. (Tr. 27).[14] The ALJ noted that Plaintiff watched movies about two times per week and enjoyed computer programming and spent hours on the computer, usually until his wife made him stop and go to bed. (Tr. 23, 27, 244, 250, 1004). Plaintiff was able to pay bills and could follow directions well. (Tr. 23, 27, 251). Plaintiff appeared to have no limitations with his ability to concentrate and recall information. (Tr. 23, 661, 665, 1005). During the consultative, psychological evaluation, Plaintiff earned an average intelligence score. (Tr. 23, 27, 1005). The ALJ noted that one of Plaintiff's treating psychiatrists stated, "'Patient in full control of the thought without thought blocking, insertion, withdrawal or broadcasting.'" (Tr. 20, 27, 315). Further, the ALJ noted that multiple mental status examinations consistently showed that Plaintiff was an alert individual with full orientation and linear/logical thought process. (Tr. 20-22, 27, 336-37, 889, 984). The record reflects that substantial evidence supports the ALJ's conclusion.

_____

[14]"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

Lastly, the ALJ determined that there was no evidence in the record of decompensation by Plaintiff. (Tr. 28).[15] Plaintiff does not challenge this conclusion.

Plaintiff cites that the State agency psychological experts found that Plaintiff had mild restrictions in activities of daily living and moderate difficulties with social functioning and in concentration, persistence or pace. (Tr. 81, 94). The ALJ gave these opinions little weight, explaining, that, unlike consulting psychologist Bobbie Hand, the State agency psychological experts did not examine Plaintiff and that the State agency experts relied on Plaintiff's statement of being able to pay attention for only about 10 minutes, despite Plaintiff's remaining on the computer until his wife made him stop at 1:00 a.m. to go to bed. (Tr. 27). The ALJ also explained that after the State agency's experts' opinions were rendered, Plaintiff was deemed stable at least four times and Plaintiff reported a stable mood in January 2016. (Tr. 26, 27, 983).

---

[15]20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4) provides:

Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

*The term repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

Id. (Emphasis in original).

The ALJ also noted that the State agency's experts relied heavily on Plaintiff's Global Assessment Functioning ("GAF") Score of 55.[16] (Tr. 27). The ALJ found that the consulting psychological examiner's opinion was consistent with Plaintiff's GAF scores that typically ranged between 61-65, indicating only mild symptoms of mental impairment.[17] (Tr. 21, 26, 461, 509, 515, 550, 718, 865, 872, 890, 903, 910, 919, 985). The ALJ gave great weight to these GAF Scores because they were "fully supported by the unremarkable and essentially normal mental status examinations, which normally revealed full orientation and linear/logical thought process." (Tr. 26). The ALJ determined that Plaintiff's GAF Score of 55 was when Plaintiff "was distressed over his wife's hospitalization relating to complications of giving birth and to his caring for their three young sons, including a newborn; and to conflict with a neighbor." (Tr. 26, 20, 331, 535, 600). The ALJ concluded, however, that Plaintiff's "main source of stress seemed related to his marital problems." (Tr. 26, 21, 22, 887, 983).

"A GAF score is a 'subjective rating of an individual's overall psychological functioning,' which may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (citing *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir.2007)). "A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F.

---

[16]A GAF score of 51-60 reflects moderate symptoms (*e.g.*, flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed., Text Rev. 2000) (*DSM-IV–TR* ).

[17]A GAF score of 61 to 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed., Text Rev. 2000) (*DSM-IV–TR* ).

App'x 681, 684 (6th Cir. 2011) (citation omitted); *see also* 65 Fed.Reg. 50746, 50764-65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."). The Sixth Circuit has "looked to the inconsistency between one doctor's assigned GAF score and a different doctor's opinion as a proper basis for rejecting the latter doctor's opinion." *Miller*, 811 F.3d at 836 (citing *Gribbins v. Comm'r of Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir.2002)).

Here, the Magistrate Judge concludes that the ALJ appropriately cited the GAF scores of 61-70 in assessing Plaintiff's mental limitations and rejecting scores of 55 that were inconsistent with his review of the record as a whole. As the ALJ explained, the higher scores were consistent with Plaintiff's activity level and medical findings. *See Daniel v. Comm'r of Soc. Sec.*, 527 F. App'x 374, 375 (6th Cir. 2013) (where the ALJ explained that he found the evidence gathered by Dr. Cho to be in tension with the GAF score and therefore looked to the to the longitudinal treatment record for a more accurate picture, the Sixth Circuit concluded that this was "a reasonable explanation for the ALJ's decision to weigh Dr. Cho's conclusion less heavily than the 'detailed narrative summary' of his clinical findings."); *Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 375 (6th Cir. 2017) ("The ALJ appropriately discredited Dr. Spring's GAF score because it was inconsistent with his own examination report and the record as a whole."). If the record reflects conflicting evidence, the ALJ, and not the district court, is to resolve those conflicts and that resolution must stand if supported by substantial evidence. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("It is for the Secretary to resolve conflicts in the evidence and to decide questions of credibility."); *Madden v. Comm'r of Soc. Sec.*, 184 F. Supp 2d 700, 706 (S.D. Ohio 2001).

Accordingly, based upon the entire record, the Magistrate Judge concludes that the ALJ's conclusions are supported by substantial evidence and that this claim of error fails.

### 3. The ALJ erred by improperly discounting Plaintiff's statements about limitations.

Plaintiff argues that "the ALJ appears to feel the Plaintiff was somehow lying about his disability being determined to be service-connected by the VA," but that "a thorough examination of the VA record and the Plaintiff's testimony indicates that he was operating as a forward observer when he was nearly hit with a large bomb." (Docket Entry No. 16, at 13). Plaintiff also argues that the ALJ "appears to make much of the fact that the Plaintiff was able to work in a management position for a number of years after his service in the Army ended." *Id.* Plaintiff further argues that "isolated examples of tasks or chores that a plaintiff can perform do not suggest that the Plaintiff can perform these activities on a sustained basis, as required by the Regulations." *Id.* at 13-14.

Social Security Ruling 16-3p, effective March 28, 2016, "provides guidance about how [the Social Security Administration] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." SSR 16-3p, 2016 WL 1119029, at *1 (S.S.A. Mar. 16, 2016); SSR 16-3p, 2016 WL 1237954 (S.S.A. Mar. 24, 2016) (amending the effective date of SSR 16-3p to March 28, 2016).[18] SSR 16-3p, in relevant part, provides:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other

---

[18]SSR 16-3p superseded SSR 96-7p. SSR 16-3p became effective on March 28, 2016, which was after the ALJ hearing but before receipt of evidence from the consulting psychological examiners and the ALJ's decision on May 4, 2016. The parties cite the applicability of SSR 16-3p to the ALJ's decision.

> evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

*Id*. at *7. Instead of "focusing on credibility, the new ruling focuses on consistency." *Barncord v. Comm'r of Soc. Sec.*, No. 2:16-CV-389, 2017 WL 2821705, at *8 (S.D. Ohio June 30, 2017). The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the term 'credibility' . . . to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (citation omitted); SSR 16-3p, 2016 WL 1119029, at *1 ("[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character.").

"SSR 16-3p instructs ALJs in accordance with the applicable regulations to consider all of the evidence in the record in evaluating the intensity and persistence of symptoms after finding the claimant has a medically determinable impairment . . . ." *Coffey v. Comm'r of Soc. Sec.*, No. 1:16-CV-222-SKL, 2017 WL 3528952, at *8 (E.D. Tenn. Aug. 16, 2017). As to a plaintiff's subjective symptoms, the regulations require an ALJ to consider certain factors, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken; (5) treatment, other than medication, to relieve pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7 ("In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) . . . ."); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . .

describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[19]

The ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of [claimant's alleged] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 25). Although Plaintiff contends that the ALJ unfairly rejected his claim that he was a combat veteran, citing VA records that indicated that he was exposed to combat and a bomb was nearly dropped on him, the ALJ found there was conflicting evidence in the record. The ALJ noted that the record reflected that Plaintiff served "in the U.S. Army from 1989-1995, 'without any combat experience in Iraq at desert storm,'" and that Plaintiff's DD Form 214 did not reflect any real exposure to combat. (Tr. 20, 25, 313, 526, 539, 546, 567, 577). At the ALJ hearing, Plaintiff testified that he was in firefights, but made no mention of a bomb almost being dropped on him. (Tr. , 23, 43). Plaintiff also testified that he dislocated his shoulder while in Iraq when a new driver moved a vehicle on which Plaintiff was on top, causing his injury. *Id*. However, in January 2013, Kristin L. Reed, Ph. D., noted that Plaintiff "reported that a bomb was dropped and threw their vehicle forward and he felt the vibration go through his body. His shoulder was 'ripped out of socket.'" (Tr. 744, 841).

The ALJ also noted that "long after his discharged from the Army, claimant worked full time for a number of years at highly skilled occupations, including store manager of a Radio Shack retail

---

[19]"Both SSR 16-3p and 96-7p refer to the two-step process . . . and the factors listed in 20 C.F.R § 404.1529(c)." Perry v. *Comm'r of Soc. Sec.*, 2017 WL 4077151, at *7 n.7 (N.D. Ohio, Sept. 14, 2017); *Bijedic v. Berryhill*, No. 15 C 6864, 2017 WL 2404950, at *2 (N.D. Ill. June 2, 2017) ("[T]he factors to be considered in evaluating symptoms under either SSR 96-7p or SSR 16-3p are the same.").

store from 1999 to 2008, where he ran all operations and supervised 25 employees," and after being "laid off as a Regional IR Consultant, he bounced around to a few other managerial jobs, was seeking management positions in 2013, and collected unemployment insurance benefits in 2014, indicating that he has certified to the State Department of Labor that he is 'ready, willing, and able to work.'" (Tr. 25, 17, 22). "Prior work with an impairment may, of course, be a legitimate factor for consideration." *Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985). Plaintiff argues that according to the VA website, PTSD often has a delayed onset in which claimants may not exhibit symptoms until months or years after the traumatic event. However, Plaintiff does not cite any medical evidence in the record to support this assertion. Moreover, "[a]pplications for unemployment and disability benefits are inherently inconsistent," because "[t]here is "no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-02 (6th Cir. 2004) (citation omitted). While not determinative, "an ALJ may properly consider the receipt of unemployment benefits together with all the other medical and nonmedical evidence presented before him." *Webster v. Colvin*, No. 3:13-CV-497-TAV-HBG, 2014 WL 4095341, at *9 (E.D. Tenn. Aug. 19, 2014); *see id.* ("[T]he receipt of unemployment benefits, while an appropriate factor that should be considered in disability claims, is only one of the many factors an ALJ must consider, and as such, the appropriate weight due to the receipt of unemployment benefits will depend on the particular facts of each case.").

In addition to discussing the medical record, the ALJ summarized Plaintiff's testimony at the ALJ hearing. The ALJ noted that Plaintiff testified that he only goes out in public with his wife;

that he often has to sit in the car after arriving places; that he goes into public about twice per week; that he attends his son's hockey practice as often as he can, but sits off to himself at hockey practice and sometimes has to go to the car and wait there; that he can follow a 30-minute show okay, but usually has to break for 15 minutes during a full movie; and that he has had rare daytime flashbacks of Iraq, especially smell of burning oil or loud sounds. (Tr. 24-25).

The ALJ noted that Plaintiff reported in August 2013 that his nightmares seemed unrelated to an actual event that happened during his military service, while denying flashback; that Plaintiff in February 2014 reported that "this was the first time [he] had left home in two weeks, yet simultaneously stated he took his son to speech therapy every Tuesday." (Tr. 25). Significantly, in addressing the consistency of Plaintiff's statements, the ALJ noted, in part, the following:

It was also most telling that when his PTSD was deemed stable in October 2015, when the claimant reported doing well with current medications, he denied several symptoms, to include any suicidal/homicidal ideation, manic/hypomanic symptoms, any psychosis, hearing voices or being watched. Regardless, **only one day later** when undergoing a C&P examination for review of PTSD; he endorsed a myriad of symptoms to include flashbacks (which he consistently denied during treatment otherwise); nightmares related to his military experience (which was actually without any combat experience in Iraq at Desert Storm); avoidance of school-wide events (though testified he attended his son's hockey practice); inability to stay still (not noted in treatment records); and that his memory was shot (yet, his thought process remained linear/logical throughout treatment).

Additionally, as recently as January 2016, he reported a stable mood.

Furthermore, claimant has never been hospitalized or presented to the emergency room department for PTSD symptoms/behavior. His activities of daily living are full and robust, to include driving every day, helping take care of his three young children, one of whom is a special needs child; taking them to numerous appointments, including physical speech and occupational therapy and hockey practice. . . . Claimant testified that he was charged with assault in December 2015; yet he subsequently told the psychological examiner that he had never been arrested. Finally, the claimant stated in the function report that he could only pay attention for 10 minutes; yet stated he got on the computer and usually searched the Web for news

> stories and was usually there until his wife made him get off about 1:00 a.m. to go
> to bed.

(Tr. 26, 21) (emphasis added). The ALJ concluded, "The claimant's subjective complaints are not persuasive to the extent alleged." (Tr. 26).

"A claimant's testimony may be discounted if it is contradicted by the medical reports and other evidence in the record." *Harley*, 485 F. App'x at 804; 20 C.F.R. § 404.1529(c). If an ALJ "simply erred in a factual finding," courts "are not to second-guess," "[a]s long as the ALJ cited substantial, legitimate evidence to support his factual conclusions." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). In weighing the factors in 20 C.F.R. § 404.1529(c)(3), "the Commissioner has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). An ALJ's determination is entitled to great deference. *Ulman*, 693 F.3d at 714 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (citation omitted).

Here, the ALJ properly considered Plaintiff's subjective complaints in the context of the record as a whole. The Magistrate Judge concludes that the ALJ's assessment of the evidence was based upon substantial evidence in the record.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) be **DENIED**, and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with

a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 20th day of September, 2017.

/s/      Joe  B.  Brown
JOE B. BROWN
United States Magistrate Judge